IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| JILL HEIM, | : | CIVIL ACTION |
| | : | NO. 19-16845 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| CAPE RESORTS MANAGEMENT CO., | : | |
| | : | |
| Defendant. | : | |

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                           August 19, 2021

## I.  INTRODUCTION

After five years of employment, on March 20, 2019, Plaintiff Jill Heim was terminated at forty-nine years old from her position as Director of Group Sales for Defendant Cape Resorts Management Company. The stated reason for her termination was that "[p]laintiff had arranged to meet with the general manager of a competing property without requesting permission to do so and without substantiating the meeting on her weekly sales report." Def.'s Mot. Summ. J. 10, ECF No. 24. Plaintiff now brings this civil action for age discrimination under the New Jersey Law Against Discrimination ("LAD").

Defendant moves for summary judgment, contending that Plaintiff fails to (1) establish a prima facie case of age

discrimination, and (2) persuade the Court that the reason for her termination was mere pretext. For the reasons explained below, Defendant's motion for summary judgment will be denied.

## II.  BACKGROUND[1]

### A. Defendant's Business and Management

Defendant is a New Jersey corporation with approximately eight hundred employees. Among the forty-five senior managers Defendant had, "27 percent [were] 55-plus and 62 percent [were] over 40." Bashaw Dep. 33:23-34:1, ECF No. 25-5. Curtis Bashaw (CEO for Defendant) described Defendant's core business as "95 percent or more transient revenue" reflected by approximately $50 million in annual revenue. Bashaw Dep. 20:14-21:15. Plaintiff, as the Director of Group Sales, worked on corporate sales, which brought in approximately "[$]500,000 a year," which is considered by Bashaw to be "a de minimis part of our revenue." Bashaw Dep. 18:4-6.

According to Bashaw, the most important aspect of Defendant's Sales Department after launching a new website in 2018 was to ensure that "transient e-mails and website are all in ship-shape." Bashaw Dep. 20:25-21:3. Bashaw stated that "[n]obody worked on outreach for sales since [Plaintiff] left" in March 2019 because "there was really not a lot of growth in the department, it was

---

[1]     The facts set forth herein are either uncontested or, if contested, are viewed in the light most favorable to the non-moving party, i.e., Plaintiff.

pretty static, for many years." Bashaw Dep. 19:13-21. Although Jessica Nagel, "a junior event coordinator-type person," was receiving Plaintiff's emails, Bashaw testified that Defendant was "hoping to hire a more global senior salesperson in 2020." Bashaw Dep. 16:8-11.

Patrick Logue, who hired and supervised Plaintiff, was Defendant's Vice President of Operations until September 30, 2019.

Until November 2019, Marc Lubchansky was the General Manager of Congress Hall, a Cape Resorts property where the sales office was located. His job responsibilities included, inter alia, "overseeing the . . . food and beverage departments, the hotel itself, front desk, housekeeping, engineering, [and] checking with all of those managers," including Plaintiff. Lubchansky Dep. 9:16-20, ECF No. 25-5. He participated in weekly sales meetings with Plaintiff, Nagel, and Logue. At Logue's recommendation, Lubchansky extended Nagel's employment and promoted her to a sales coordinator working with Plaintiff. Logue also approved of Nagel replacing Plaintiff on Plaintiff's days off.

In October 2019, Defendant on-boarded a new President of Operations, Cindy D'Aoust, who is approximately fifty years old and had been a consultant for Defendant since at least July 2019. D'Aoust also became the acting general manager of Congress Hall when Lubchansky left in November 2019.

**B. Plaintiff's Employment with Defendant**

In 2014 Defendant hired Plaintiff, a woman with twenty years of experience in the hotel industry, in a full-time position as Director of Group Sales. Plaintiff signed a non-compete agreement stipulating that she "will not be employed by, contract with, consult or otherwise advise any company based in Cape May County, NJ for a period of two (2) years" following her termination with Defendant, and would not disclose, at any time, "information obtained during employment that is not publicly available." Pl.'s Resp. Opp'n Def.'s Mot. Summ. J. Ex. S, ECF No. 25-9.

Plaintiff was also bound by Defendant's Executive Handbook of policies and procedures that specified, inter alia, that an employee's performance is continuously evaluated throughout employment, that Defendant has four forms of disciplining employees for misconduct (verbal counseling, written warnings, suspension, and employment termination), and that an employee's act of "gross misconduct," such as "[b]latant disregard of supervisor's direction," could lead to termination. Pl.'s Resp. Opp'n Def.'s Mot. Summ. J. Ex. L, at 8–11, ECF No. 25-7.

Logue created Plaintiff's position and job description. Plaintiff's job functions were to generate sales leads, create and negotiate contracts for incoming groups, communicate with clients, follow up on proposals, go to networking events, create budgets

and forecasts, report on sales, and work on the annual marketing report and budget. Plaintiff reported to Lubchansky, who reported to Logue, but Plaintiff dealt with both supervisors daily. Plaintiff worked remotely but was required to be on site once a week for sales meetings or as needed.

Although Logue gave Plaintiff high recommendations in August 2017 when she applied for a tourism and hospitality management Master's Degree, specifically commending her team spirit and dedication to Defendant's business, Logue testified that Plaintiff "needed a lot of coaching . . . consistent[ly] throughout her employment." Logue Dep. 20:14-16, ECF No. 25-4. Lubchansky described Plaintiff as a "very nice" person who was "very familiar with the business." Lubchansky Dep. 11:11-15, ECF No. 25-5.

Plaintiff's performance was measured by the total group revenue target for the year. Logue testified that Plaintiff's annual targets were generally met and sometimes exceeded, and that Defendant's top-line revenue grew during her employment.

Plaintiff always handed the sign-up group contracts to sales coordinators in the sales team. When one of the sales coordinators retired, Nagel, an intern at the time, was promoted to sales coordinator and took over those responsibilities in July 2018. Nagel complained that Plaintiff "was difficult to reach and was pushing back when requested to assist in particular areas" of

Nagel's work. Logue Dep. 31:3-9. Nagel had also complained about another employee in June 2017.

Logue stated that he received similar complaints about Plaintiff from the retired sales coordinator. Logue allegedly addressed the "[in]flexibility" and "difficult to reach" complaints with Plaintiff on several occasions. Logue Dep. 34:15-35:18. In response, Plaintiff "offered reasons why she was away from her phone, that she would be running errands or going to meetings or taking her son to school." Logue Dep. 35:19-24. Logue believed that Nagel's concerns were legitimate because his office was in the same sales office and he could hear Nagel's conversations and see her frustration.

Plaintiff alleged that Logue made statements in September and October 2018 that he was on "team [Nagel]" and was going to make sure she succeeded. Pl.'s Dep. 59:1-9, ECF No. 25-2. Logue disputes making those statements.

Lubchansky testified that October 2018 at Congress Hall was "very, very busy," and Nagel had "a lot of issues that she needed to get in touch with [Plaintiff]" about but could not reach her by phone or email. Lubchansky Dep. 18:9-16. On October 31, 2018, when Logue could not reach Plaintiff, he and Lubchansky decided to ask Plaintiff to meet with them. Logue and Lubchansky met with Plaintiff at a diner to recount their concerns and found that Plaintiff was "defensive," "emotional," and "met that kind of

feedback with resistance." Logue Dep. 36:21-37:10. Plaintiff and
Defendant dispute whether Plaintiff stated during the October 31
meeting that she wasn't going to keep her phone on during weekends.
Logue testified that he noticed marked improvement in Plaintiff's
attitude after that meeting.

A follow-up meeting between Plaintiff, Nagel, and Lubchansky
occurred on November 7, 2018, to create a "reset" between Plaintiff
and Nagel and try to get them to work better together. Logue Dep.
41:1-12. Logue testified that there were no similar meetings after
the November 7 meeting because the issues had been sufficiently
addressed. Lubchansky testified that those issues "never went
away." Lubchansky Dep. 24:22-25.

Plaintiff was never officially disciplined during her
employment with Defendant except when she met with HR regarding
her dress code in 2015. Logue countered that HR and Lubchansky's
lack of awareness of any written warnings issued to Plaintiff did
not mean there weren't any; Logue, however, did not provide
evidence in support of any written warnings.

**C. Plaintiff's Termination**

In March 2018, General Manager Francesca Santoro ("Santoro")
of La Mer (a resort in the area not owned by Defendant) invited
Plaintiff to dinner to "pick her brain" about La Mer renovations,
mentioning that Bashaw was "aware" of the dinner. Pl.'s Resp. Opp'n
Def.'s Mot. Summ. J. Ex. M, at 19, ECF No. 25-7. Logue reached out

7

to Bashaw for advice on whether Plaintiff could "see the renovations at La Mer so that we might refer summer groups we may not be able to handle." Id. Bashaw answered that "parameters" should be discussed. Id. Neither Logue nor Bashaw remember whether they discussed the parameters. There was no written directive given to Plaintiff in 2018 not to go to La Mer on her own, but Logue allegedly advised her orally not to meet with the general manager of a competing hotel without first bringing in her supervisors or a general manager. Def.'s Resp. Pl.'s S. Undisputed Material Facts ¶¶ 53, 55, ECF No. 26-1. Plaintiff never met with Santoro in 2018.

Logue testified that "it is important for directors of a hotel to know who the competition is and know what resources the competition has," but denied that Plaintiff made a case that her visit with Santoro would have been useful "to determine if [La Mer] were becoming a competitor." Id. ¶¶ 41-42. Because competing hotels have poached employees from them in the past, Bashaw and Lubchansky were concerned that Santoro wanted to recruit Plaintiff. Lubchansky believed that Plaintiff meeting with Santoro without telling anyone at their hotel would be interpreted as the competition "trying to poach to steal clients, to steal business," a typical "sales game." Lubchansky Dep. 50:13-20, ECF No. 25-5. Lubchansky was not aware that Plaintiff's non-compete agreement prohibited her from being involved with a competitor during her employment or for some time thereafter.

Santoro invited Plaintiff again in February 2019 and
Plaintiff agreed to go and see La Mer's renovated meeting space.
Logue heard about the meeting from another staff and was "a little
bummed" that Plaintiff had not informed him about it, so he
proposed to accompany Plaintiff together with Lubchansky at the
arranged meeting. Def.'s Resp. Pl.'s S. Undisputed Material Facts
¶ 59. Santoro ultimately cancelled the meeting. On March 8, 2019,
Logue emailed HR that he and Lubchansky were going to terminate
Plaintiff because of the 2019 La Mer meeting issue and "other
dissatisfactory and ongoing behavior related to poor performance
and collegial relations." Id. ¶ 70.

Plaintiff was fired on March 20, 2019, after a brief meeting
between Plaintiff, Logue, Lubchansky, and Rue from HR. Logue
informed Bashaw that Logue and Lubchansky decided to terminate
Plaintiff. Bashaw testified that "[p]erformance wasn't the issue.
The issue was taking a meeting with a competitor and being
insubordinate to Patrick Logue's directive and I know that there
was a history of other performance-related issues in terms of
cooperation and teamwork that had been a problem for [Plaintiff]."
Bashaw Dep. 22:7-14, ECF No. 25-5.

Lubchansky testified that the decision to terminate Plaintiff
was warranted by the fact that she continued to be unreachable
over the phone. He also believed that Plaintiff's decisions to not
turn her phone on during the weekends and to not clear her 2019 La

9

Mer meeting with management were acts of "blatant disregard of Mr. Logue's direction" and "terminable offenses." Lubchansky Dep. 36:6-37:5. He testified, however, that he never called her on the weekends, and whenever he called her during the week, she would always call him right back if she didn't answer.

On March 20, 2019, HR sent out an email advising Defendant's main operations teams that Plaintiff was no longer with the company, that all inquiries should be directed to Nagel, who "will be the main point of contact moving forward," and that "[Plaintiff's] email has been pointed to [Nagel's] email address." Def.'s Resp. Pl.'s S. Undisputed Material Facts ¶ 74. Plaintiff and Nagel were the only employees that handled group sales at the time of Plaintiff's termination.

### D. After Plaintiff's Termination

After terminating Plaintiff, Defendant divided her responsibilities "up amongst the members of the sales team" and the tasks previously handled by Plaintiff "were taken over by the sales team staff that plaintiff previously worked directly with." Def.'s Mot. Summ. J. 18, ECF No. 24. Bashaw testified that "[t]here's been no proactive sales outreach, there's been response to inquiries." Bashaw Dep. 16:24-25, ECF No. 25-5. "Nobody worked on outreach for sales since [Plaintiff] left. The team has facilitated inquiries and tried to book inquiries that come in on the telephone . . . ." Bashaw Dep. 19:13-16. Lubchansky testified

that Nagel took over Plaintiff's duties after she was terminated because they "had no one else. So it was just [Nagel]." Lubchansky Dep. 49:1-5, ECF No. 25-5.

After Plaintiff left, Nagel reported to Logue and assumed the responsibility of "weekly reports to the General Manager outlining leads received, follow-up calls, emails, client interactions, client outcomes, confirmed contracts, and contracts pending." Pl.'s S. Undisputed Material Facts ¶¶ 76, 78, ECF No. 25-1. After Nagel left Defendant in August 2019, the position was filled by Karen Knoblock, "age 22-23," who became a sales manager, had the same duties as Nagel, and was "the first point of contact for any corporate groups looking to come in for a meeting." Id. ¶¶ 81-83. After Knoblock left Defendant in March 2020, the position was filled by Jennifer O'Neill, age thirty-two, who remains responsible for group and conference sales.

In terms of allocating Plaintiff's other responsibilities, the vice-president of revenue took over the responsibilities of reviewing sales forecasts and interacting with the sales manager to decide if group business is appropriate. The vice-president of marketing took over the responsibility of monitoring marketing and advertising budgets related to group sales.

In July 2019, Plaintiff requested a release from her non-compete agreement to accept a job offer as a corporate and group sales executive for one of Defendant's competitors in Cape May.

Logue did not approve the request, and Bashaw stated that "[i]f I was asked, I would have said no," Bashaw Dep. 26:23-27:2, despite the fact that a much younger former wedding and social sales coordinator in the sales team had been released from her non-compete agreement, upon request, when she was terminated in January 2019. Plaintiff, a single mother, worked as a floater and remained without a full-time job for thirteen months.

### III.  LEGAL STANDARD

Summary judgment is appropriate if no genuine dispute as to any material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is "material" if proof of its existence or nonexistence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). At the summary judgment stage, the Court must view the facts "in the light most favorable" to the nonmoving party and "draw all reasonable inferences in favor" of that party. Young v. Martin, 801 F.3d 172, 174 n.2 (3d Cir. 2015) (citing Tri-M Grp., LLC v. Sharp, 638 F.3d 406, 415 (3d Cir. 2011)).

In employment discrimination cases, "a defendant employer is not entitled to summary judgment merely by showing the plaintiff's inability to prove [discrimination] by direct evidence" because

12

the plaintiff may also proffer circumstantial evidence that the employer's explanation of the discriminatory act is pretextual. Chipollini v. Spencer Gifts, 814 F.2d 893, 895 (3d Cir. 1987).

## IV. DISCUSSION

### A.   Unlawful Age Discrimination Under the LAD

To prevail in an age discrimination action under the LAD, an employee must "show that [age] played a role in the decision making process and that it had a determinative influence on the outcome of that process." Bergen Com. Bank v. Sisler, 732 A.2d 944, 953 (N.J. 1999) (first quoting Maiorino v. Schering-Plough Corp., 695 A.2d 353, 363 (N.J. Super. Ct. App. Div. 1997); and then quoting Greenberg v. Camden Cnty. Vocational & Tech. Sch., 708 A.2d 460, 465 (N.J. Super. Ct. App. Div. 1998)).

New Jersey courts apply the same burdens of proof and persuasion to LAD discrimination cases as those that apply to federal anti-discrimination cases. See Erickson v. Marsh & McLennan Co., 117 N.J. 539, 550 (1990) (applying the federal anti-discrimination methodology from McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), to a case under the LAD); Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 595 (1988) (same). Under the McDonnell Douglas framework, "if the plaintiff establishes the elements of a prima facie case, the employer must articulate a legitimate, non-discriminatory reason for its employment decision." Smith v.

13

Borough of Wilkinsburg, 147 F.3d 272, 278 (3d Cir. 1998). "Once such a justification is proffered, the burden then reverts to the plaintiff to prove by a preponderance of the evidence that the articulated reason is a pretext." Id.

### 1. Plaintiff has established a prima facie case of age discrimination

The McDonnell Douglas framework requires four elements for Plaintiff to establish a prima facie case of unlawful discrimination: (1) that she belongs to a protected class; (2) that she "applied and was qualified for a job for which the employer was seeking applicants"; (3) that, despite her qualifications, she was rejected; and (4) that, after her rejection, "the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).

Under New Jersey law, in relation to the fourth element, Plaintiff must show that her employment responsibilities survived, together with proof that either (1) there was a replacement with a similarly situated sufficiently younger candidate, or (2) the employer sought others to perform the work after she was terminated. See Zive v. Stanley Roberts, Inc., 867 A.2d 1133, 1145 (N.J. 2005); Bergen Com. Bank, 732 A.2d at 959; Reynolds v. Palnut Co., 748 A.2d 1216, 1219 (N.J. Super. Ct. App. Div. 2000).

"The evidentiary burden at the prima facie stage is 'rather modest: it is to demonstrate to the court that [under] plaintiff's factual scenario . . . discrimination could be a reason for the employer's action.'" Zive, 867 A.2d at 1139 (quoting Marzano v. Comput. Sci. Corp., 91 F.3d 497, 508 (3d Cir. 1996)) (first citing Tex. Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 253 (1981); then citing Torre v. Casio, Inc., 42 F.3d 825, 829 (3d Cir. 1994); then citing McKenna v. Pac. Rail Serv., 32 F.3d 820, 825 (3d Cir. 1994); and then citing Peper v. Princeton Univ. Bd. of Trs., 389 A.2d 465, 478 (1978)).

Here, Heim alleges age discrimination because Defendant terminated her but retained substantially younger individuals to perform the same duties. Defendant does not dispute that Plaintiff has established the first three prima facie elements. Instead, Defendant argues that she cannot establish the fourth element because her position was "never filled by a younger employee subsequent to plaintiff's termination," and although the position remains open, there are "presently no plans for defendant to fill the position in the future." Def.'s Mot. Summ. J. 17, ECF No. 24. Defendant alleges that even though "Plaintiff's work was divided up amongst the members of the sales team" due to business necessity, the sales team collectively assuming her duties does not constitute "replacement" because nobody was promoted to her position. Def.'s Mot. Summ. J. 18-19.

Defendant's arguments are unpersuasive for the reasons explained in Ehmann v. Sea Spa, LLC:

> There is only a subtle difference between replacement and retention. To differentiate based upon the replacement of a new employee or the substitution of an existing employee is, at best, to rely on semantics. The issue is not whether the protected individual is replaced by a new employee or an existing employee is retained to do the work following the departure, rather, the issue to be decided is whether an adverse employment action took place under circumstances that give rise to an inference of unlawful discrimination. Here, defendant retained substantially younger employees to do the job performed by plaintiff.

No. L-1165-03, 2005 WL 3439935, at *4 (N.J. Super. Ct. App. Div. Dec. 16, 2005).

Plaintiff has established the fourth element of her prima facie case because the functions of her former position as Director of Group Sales survived her termination and three sufficiently younger, similarly situated employees consecutively replaced her.

The record demonstrates that the functions of the Director of Group Sales position survived Plaintiff's termination and were reallocated immediately thereafter, except for the outreach for sales, a task that was put on hold to prioritize other things, such as ensuring Defendant's new website successfully launched. After Plaintiff was terminated, the sales team "facilitated inquiries" and booked "inquiries that c[a]me in on the telephone," and Nagel made the "weekly reports to the General Manager outlining

16

leads received, follow-up calls, emails, client interactions, client outcomes, confirmed contracts, and contracts pending." Bashaw Dep. 19: 13-16, ECF No. 25-5; Pl.'s S. Undisputed Material Facts ¶ 76, ECF No. 25-1. After Nagel left in August 2019, Karen Knoblock became "the first point of contact for any corporate groups looking to come in for a meeting," followed by Jennifer O'Neill. Pl.'s S. Undisputed Material Facts ¶¶ 81-84. Each one of these individuals, in their sales management position, was focused on group sales.

Only a few tasks that Plaintiff performed in collaboration with upper management have been completely reallocated to upper management: the decisions on group business rates versus rack rates, the overall group sales strategy, and the review of sales forecasts went to the vice-president of revenue. But the group sales manager would still present the vice president of revenue with those decisions. Logue Dep. 72:1-9, ECF No. 25-4. The vice-president of marketing completely took over monitoring marketing and advertising budgets for group sales.

The evidence that Plaintiff's job functions survived and were reallocated to other sales managers supports an inference that Defendant "had a continued need for 'someone to perform the same work after'" Plaintiff's termination. See Pivirotto v. Innovative Sys., 191 F.3d 344, 354 (3d Cir. 1999) (quoting Cumpiano v. Banco Santander P.R., 902 F.2d 148, 155 (1st Cir. 1990)). In fact,

Defendant's own argument supports this "continued [business] need" inference: "[The reallocation] was only done because business necessity required their continuation and the sales team were the only employees of Defendant that had experience and understanding of the Plaintiff's duties so that they could seamlessly complete those tasks without significant interruption to Defendant's business." Def.'s Reply Pl.'s Opp'n to Mot. Summ. J. 5, ECF No. 26. Further, an HR email sent on March 20, 2019, advised Defendant's teams involved with sales that Plaintiff was no longer with the company, informed them that the group sales business was transitioning to Nagel, and stated that "Lubchansky will be working closely with [Nagel] through this transition." Pl.'s Resp. Opp'n Def.'s Mot. Summ. J. Ex. Q, ECF No. 25-9. Thus, this email further attests to the continuity of the group sales position in the sales team.

The record also supports an inference that Plaintiff's responsibilities were reallocated to sufficiently younger employees. Both Nagel, who took over Plaintiff's duties the day she was terminated, and Knoblock, who took over after Nagel's departure in August 2019, were in their twenties. O'Neill was thirty-two years old. This evidence, combined with other facts accepted in the light most favorable to Plaintiff (e.g., Plaintiff's assertion that Logue stated that he was on "team

18

[Nagel]" multiple times to Plaintiff), creates a prima facie case of age discrimination against Plaintiff.

Defendant's argument that Plaintiff's job was eliminated because no sales employees were proactively seeking out business in Philadelphia or South Jersey is unpersuasive. Seeking out business was only one aspect of Plaintiff's job, and the record shows that Defendant still has one sales manager focused on group sales, paired with another manager for wedding and social sales.

Lastly, Defendant argues that Plaintiff's position was unique and the other employees are not similarly situated because no other employees had the remote work privileges that Plaintiff had. However, employees are similarly situated not when they have the same privileges, but when they handle comparable duties or there is routine job shuffling among them. Monaco v. Am. Gen. Assur. Co., 359 F.3d 296, 303 (3d Cir. 2004) (citing Anderson v. Consol. Rail Corp., 297 F.3d 242, 250 (3d Cir. 2002)). Nagel, Knoblock, and O'Neill, all substantially younger than Plaintiff, each negotiated group contracts, communicated with clients, followed up on proposals, and reported on group sales, just like Plaintiff did. Thus, a reasonable jury could conclude that Nagel, Knoblock, and O'Neill were similarly situated to Plaintiff even though their work privileges may have differed. See id. at 306.

As a result of the foregoing, Plaintiff has established a prima facie case of age discrimination, and Defendant's motion for summary judgment on this basis will be denied.

### 2. **Defendant has proffered a legitimate, nondiscriminatory reason for Plaintiff's termination**

Once the prima facie burden is met, the burden shifts to the employer to produce a "legitimate, nondiscriminatory reason" for its disparate treatment of the employee. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Defendant need not prove that the articulated reason actually motivated the discharge. Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).

Here, Defendant's first proffered nondiscriminatory reason for Plaintiff's termination is Plaintiff's "gross misconduct" in failing to follow Logue's directive not to arranging a meeting with Santoro without first clearing such a meeting with senior management. Def.'s Mot. Summ. J. 17, ECF No. 24. Defendant's second proffered nondiscriminatory reason is Logue's dissatisfaction with Plaintiff refusing to answer her phone on weekends and Plaintiff's general unavailability.

Plaintiff does not dispute that Defendant has proffered a potential legitimate nondiscriminatory reason due to her agreeing to an unapproved meeting with Santoro in March 2019.[2] However, she

---

[2]    Although Plaintiff disputes the admission of Defendant's second nondiscriminatory reason because Defendant did not raise it in its interrogatory answers, the Court need not consider this argument because Plaintiff's evidence raises a triable issue of material fact as to whether

argues this reason is pretextual. Thus, the Court will move on to
the pretext issue.

### 3. **Plaintiff has raised a triable issue of material fact as to whether Defendant's nondiscriminatory reasons for her termination were pretextual**

The standard for evaluating pretextual nondiscriminatory
reasons under the LAD is whether the "inconsistencies and
implausibilities in the employer's proffered reasons for discharge
reasonably _could_ support an inference that the employer did not
act for nondiscriminatory reasons, not whether the evidence
_necessarily_ leads to [the] conclusion that the employer did act
for discriminatory reasons." Chipollini v. Spencer Gifts, 814 F.2d
893, 900 (3d Cir. 1987) (citing Graham v. F.V. Leopold Co., 779
F.2d 170, 172-73 (3d Cir. 1985)). Plaintiff can show that each of
Defendant's nondiscriminatory reasons for termination were
pretextual by presenting evidence which demonstrates that the
Defendant's reasons are "weak, implausible, contradictory, or
incoherent." Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994).

Defendant's first nondiscriminatory reason for terminating
Plaintiff is her alleged "gross misconduct" in 2019 when she
disobeyed Logue's directive not to arrange a meeting with Santoro,
a directive that was apparently given to Plaintiff in 2018.

---

both of Defendant's nondiscriminatory reasons for her termination were
pretextual, as explained below.

A reasonable jury may find it implausible that Plaintiff received a directive from Logue in 2018 not to arrange a meeting with Santoro. Plaintiff alleges Logue told her not to "waste her time" by going to dinner with Santoro, which is not a clear directive. Pl.'s Dep. 29:5-23, ECF No. 25-2. Although Logue did not admit to saying that, but rather to advising Plaintiff that she was not to arrange a meeting with Santoro without first bringing in her supervisors or a general manager, there is no evidence that he actually gave this directive to Plaintiff. Neither Plaintiff's contract nor Defendant's Employee Handbook contains such a directive, and even though Logue knew that it was "not unusual for an incoming general manager to get to know the competition," neither he nor Bashaw put a directive in writing to preempt a misconduct such as Plaintiff's from happening. Logue Dep. 48:2-9, ECF No. 25-4.

Furthermore, Logue's stated reason for not allowing the meeting, i.e., "[c]oncerns about proprietary exchange of information from our company to a general manager of a competing hotel," Logue Dep. 45:2-4, is arguably weak because Plaintiff had already signed a non-compete agreement that addressed those exact concerns. Thus, Plaintiff's evidence has demonstrated sufficient weaknesses and implausibilities in Defendant's first proffered reason for discharge that could reasonably support an inference that Defendant did not act for nondiscriminatory reasons.

Defendant's second proffered nondiscriminatory reason for terminating Plaintiff is her "unwillingness to answer her phone on days off and Plaintiff not being available and supporting other members of the sales staff." Def.'s S. Undisputed Material Facts ¶ 19, ECF No. 24. Lubchansky testified that Plaintiff said she "didn't have to answer the phone" and that she shuts her phone off on weekends and doesn't keep it on. Lubchansky Dep. 21:1-25, ECF No. 25-5. Plaintiff testified, however, that she was regularly checking her email "on nights and throughout weekends," that she "did not advise Logue or Lubchansky that her phone was going to be off on weekends," Pl.'s S. Undisputed Material Facts ¶ 27, ECF No. 25-1, and that she always kept her phone "on and with her at all times." Pl.'s Resp. Def.'s S. Undisputed Material Facts ¶ 16, ECF No. 25-11.

Regardless of this he said, she said issue, Defendant's argument concerning Plaintiff's availability and support is blatantly inconsistent with both Lubchansky and Logue's testimonies. Lubchansky testified that whenever he called Plaintiff and she did not answer, she would immediately call him back. Lubchansky Dep. 61:7-10. Logue testified that after the October 31 meeting, he saw a "marked improvement" in Plaintiff's communication and that the matter between her and Nagel was "addressed sufficiently." Logue Dep. 41:1-42:8, ECF No. 25-4. Thus, Plaintiff's evidence has demonstrated sufficient

inconsistencies in Defendant's second proffered reason for discharge that could reasonably support an inference that Defendant did not act for nondiscriminatory reasons.

To the extent Defendant argues that age discrimination was clearly not a factor in Plaintiff's termination because sixty-two percent of Defendant's senior managers are over forty years old, this argument is unpersuasive. Evidence of a "governing majority" of the same kind did not dispel the presumption of intentional discrimination against one of that kind in Castaneda v. Partida, 430 U.S. 482, 500 (1977), because: (1) that evidence did not demonstrate that there was no reason to discriminate, and (2) the presumption that "human beings would not discriminate against their own kind" is patently false. Id.

As a result of the foregoing, Defendant's nondiscriminatory reasons for discharging Plaintiff have been placed in substantial doubt by evidence of weaknesses, implausibilities, and inconsistencies. See Chipollini, 814 F.2d at 900. Thus, Plaintiff has raised a triable issue of material fact as to whether Defendant's nondiscriminatory reasons for her termination were pretextual.

## V.   CONCLUSION

As a result of the foregoing, Defendant's motion for summary judgment will be denied. An order consistent with this memorandum shall issue.

24